# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RASHID MANSOUR, et al., | CASE NO. CV F 08-1313 LJO DLB |
| Plaintiffs, | **SUMMARY JUDGMENT DECISION** (Doc. 19.) |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

The Food and Nutrition Service ("FNS") of the U.S. Department of Agriculture ("USDA") disqualified plaintiffs Rashid Mansour ("Mr. Mansour") and Two Way Fruit Stand, Inc.'s ("TWFS'") participation in the federal Food Stamp Program ("Program") due to what FNS characterizes as repeated acceptance of "food stamp benefits from customers in exchange for consideration other than eligible food products." Defendant United States of America ("Government") seeks summary judgment to uphold Mr. Mansour and TWFS' (collectively "plaintiffs'")[1] permanent disqualification and further seeks summary judgment on plaintiffs' due process challenges to their permanent disqualification. Plaintiffs challenge their permanent disqualification as based on insufficient evidence and explain that the small percentage of irregular transactions arise from attempts to assist impoverished customers. This

---

[1] Mr. Mansour is TWFS owner and president.

1

Court considered the Government's summary judgment motion on the record[2] and VACATES the November 12, 2009 hearing, pursuant to Local Rule 78-230(h). For the reasons discussed above, this Court DENIES the Government summary judgment that permanent disqualification is warranted and GRANTS the Government summary adjudication on plaintiffs' denial of due process and unconstitutional regulation claims.

## BACKGROUND

### The Food Stamp Program

The Program is administered under the Food Stamp Act ("Act"), 7 U.S.C. §§ 2011, et seq, and its governing regulations, 7 C.F.R. §§ 270-282. Congress designed the Program to alleviate hunger and malnutrition of low-income households by augmenting their ability to purchase food. 7 U.S.C. § 2011, 2013(a). Congress determined that food stamps may be redeemed only for food items at retail stores which are approved for Program participation. 7 U.S.C. § 2013(a). Food stamps may not be redeemed for ineligible items or accepted for eligible food sold on credit. 7 C.F.R. § 278.2(f). Food stamps are redeemable at face value by the USDA Secretary through the U.S. Treasury. 7 U.S.C. § 2013(a).

Only retailers who effectuate Program purposes are authorized to accept food stamps in exchange for eligible food items. 7 U.S.C. § 2018; 7 C.F.R. § 278.2(a). Prior to authorization to participate in the Program, a retailer must certify that it has read and is familiar with governing statutes and regulations. The Program's statutory and regulatory scheme provides for retailer disqualification (or a civil money penalty in exceptional circumstances) if a retailer accepts or uses food stamps to violate the Program. 7 U.S.C. § 2021(a); 7 C.F.R. § 278.6(a).

The Government characterizes "trafficking" – food stamp buying and selling – as a "major problem." Trafficking is defined as "the buying or selling of coupons . . . or other benefit instruments for cash or consideration other than eligible food . . ." 12 C.F.R. § 271.2. FNS is authorized to

---

[2] This Court carefully reviewed and considered all arguments, points and authorities, declarations, testimony, statements of undisputed facts and responses thereto, objections and other papers filed by the parties. Omission of reference to an argument, document, objection or paper is not to be construed to the effect that this Court did not consider the argument, document, objection or paper. This Court thoroughly reviewed, considered and applied the evidence it deemed admissible, material and appropriate for summary judgment. This Court does not rule on evidentiary matters in a summary judgment context, except to the extent that it does not consider matters inappropriate for summary judgment determination.

permanently disqualify a retailer upon an initial violation of trafficking.  7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i).

**Electronic Benefit Transfer System**

The Program replaced food stamps or coupons with the Electronic Benefit Transfer ("EBT") system which utilizes a card ("EBT card") with a magnetic strip similar to a debit card.  With an EBT transaction, a Program retailer is electronically credited with funds by a private bank.  The Government reimburses the funds based on the amount of Program benefits exchanged for eligible food items.  FNS has access to detailed information on individual transactions at Program retailers by particular Program recipients through EBT records.

In a typical EBT transaction, the retailer rings up the food purchase total and swipes the Program recipient's EBT card in a point of sale device ("POS").  The recipient verifies the amount that will be debited from the account and enters a personal identification number ("PIN").  The POS sends the information to a host computer to validate the information and to respond to the POS.  A receipt is produced to show the retailer number, recipient's identification number, purchase amount, purchase approval or denial, and recipient's account balance.  Approval or denial is promptly returned.

The Government notes that food stamp trafficking has been "a major problem" in that Program recipients have sold food stamps to retailers for half of face value in exchange for cash and retailers redeem the stamps for full face value.  EBT enables FNS to track benefits from recipient to retailer and to identify trafficking transactions and patterns from electronic data.  Every transaction at an authorized retailer is recorded electronically to identify the recipient EBT card number, amount of food stamp purchase, and transaction date and time.

FNS uses the Antifraud Locator Retailer Transactions system ("ALERT") to identify potentially fraudulent stores by scanning EBT transactions for trafficking patterns.  The FNS initiates action against a retailer based on data from ALERT, store visits and additional data analysis.  The Act validates use of evidence from a transaction report under the EBT system.  7 U.S.C. § 2021(a).

**FNS Investigation Of Plaintiffs**

Plaintiffs operate Two Way Fruit Stand ("Two Way"), a medium-sized grocery store in an impoverish, crime-ridden section of Fresno.  Plaintiffs note that Two Way had been authorized to

3

participate in the Program for more than 30 years. Two Way offers fruits, vegetables, canned foods, breads, dairy products, meats and poultry.

The Government notes that during a February 8, 2008 visit of Two Way, an FNS representative observed:

1. Food stock typical of a medium-sized grocery store;
2. Some available fresh produce but no fresh meats and bulk items;
3. No advertising of meat or produce specials;
4. The two small checkout areas with the larger having less than six feet of uncluttered space on which to place items; and
5. Four shopping carts and about 50 baskets.

During the store visit, Mr. Mansour informed the FNS representative that plaintiffs lack a formal policy to deliver groceries to customers but occasionally give customers a ride home with their groceries.

**FNS Charge Letter And Trafficking Determination**

FNS Officer-In-Charge Teresa L. Toups ("Officer Toups") sent a May 27, 2008 letter ("charge letter") to Mr. Mansour to detail "clear and repetitive patterns of unusual, irregular, and inexplicable FSP [Program] activity for your type of firm." The charge letter and its numerous attachments identified transactions or sets of transactions during October 2007 to April 2008 which FNS characterized as usual and irregular based on transaction information including dates, times, Program recipient numbers and monetary amounts. More particularly, the attachments included:

1. 24 exhibits of multiple withdrawals from accounts of more than one Program recipient within unusually short time frames (less than five minutes apart);
2. 41 exhibits of which the same recipient made multiple withdrawals within unusually short time frames (minutes or seconds apart);
3. 33 exhibits of EBT transactions which depleted in one day 98-100 percent of the recipient's available benefits;
4. 294 exhibits of an unusual number of EBT transactions ending in the same cents value (total amounts ending in even dollar amounts, $xx.95 or $xx.99);
5. 20 exhibits of excessively large withdrawals ranging from $101.55 to $401.22 from a

1                    recipient's account during a single EBT transaction; and

2        6.          163 exhibits of high-dollar EBT transactions which were manually entered without
3                    swiping the recipient's EBT card.

Based on this information, FNS charged plaintiffs with trafficking violations. The charge letter noted that Program regulations "provide that, under certain conditions, FNS may impose a civil money penalty (CMP) . . . in lieu of permanent disqualification." The charge letter directed: "If you request a CMP, you must meet each of the four criteria listed [in 7 C.F.R. § 278.6(i)] and provide the documentation as specified within 10 days of your receipt of this letter."

On May 28, 2008, Mr. Mansour telephoned Officer Toups to discuss the charge letter and inquire as to what he needed to do to "remedy the situation." Mr. Mansour attributes Officer Toups to have stated to Mr. Mansour and Two Way manager Mohammand Mansour that "the matter should be resolved without a problem," to just "provide the reply information" and requested documents and that there was "no need" to "retain an attorney." In his declaration, Mr. Mansour states: "I had no reason to believe that Two Way would be permanently disqualified from participating in the Defendant's Food Stamp Program. I supplied further information to the USDA on May 30, 2008, explaining that a small percentage of our customers [sic] grocery habits are causing the alleged 'irregularities.'"

Plaintiffs responded to the charge letter with their letter received by FNS on May 30, 2008 to provide the following explanations:

**1.       Multiple Transactions Of One Or More Household Accounts:**

-Many Program recipients come with EBT cards of friends, family or neighbors and shop for the friends, family or neighbors and themselves to result in several EBT transactions within a short period.

**2.       Multiple Transactions Of Individual Household Accounts:**

-Many households hold one Program account but request separate purchase receipts to result in multiple withdrawals from the one account in a short period.

-Elderly customers insist on separate purchase receipts for perishable and non-perishable items.

**3.       Transactions Depleting Household Allotments:**

1              -Many family-owned local restaurants take advantage of sales and specials and make EBT
2  card purchases for their restaurants.
3              -Plaintiffs sell more than $10,000 of fresh meat each month.
4              -Parks and funeral parlors are nearby, and Program recipients often make large purchases
5  for picnics and funerals.
6              -Many Program households without transportation make large purchases which plaintiffs
7  deliver.

    **4.**   **Excessive Same Cents Value Transactions:**

    -Recipients request that their EBT card be debited a set amount.

    **5.**   **Excessive Transactions:**

    -Recipients buy large amounts of fresh meat.

    -Recipients without transportation make large purchases.

    -Program households buy large quantities for picnics and funerals.

    **6.**   **Manual Key-Entered Transactions:**

    -More than half of the recipients have damaged EBT cards.

Ms. Toups responded with her July 2, 2008 letter to "find that the violations cited in our charge letter occurred at your firm. . . . Therefore, your firm shall be permanently disqualified from the Food Stamp Program, effective upon receipt of this letter." The letter explained that plaintiffs were ineligible for a civil money penalty "because you failed to submit sufficient evidence to demonstrate that your firm had established and implemented an effective compliance policy and program to prevent violations of the Food Stamp Program."

On July 9, 2008, Mr. Mansour and Two Way manager Mohammand Mansour telephoned Officer Toups to discuss issues which Officer Toups identified as needing "more depth," including sale of fresh meat and poultry. Mr. Mansour declares that he and Mohammand Mansour explained that Two Way stores fresh meat and poultry in a cold box in the store's back to deter theft and that at a customer's request, a Two Way employee collects such food items for purchase. Mr. Mansour declares that "Officer Toups informed me that she was 'comfortable' with the additional information."

/ / /

**Administrative Review**

FNS granted Mr. Mansour's written request for administrative review of permanent disqualification. FNS Administrative Review Officer Andrew Furbee's ("ARO Furbee's") July 11, 2008 letter required plaintiffs within three weeks to provide "additional information . . . in support of your position."

Mr. Mansour notes that he provided ARO Furbee with a letter with "the information he had discussed with Officer Toups." Plaintiffs also provided a document entitled "RULES END [sic] REGULATIONS FOR FOOD STAMP PROGRAM." The Government notes that plaintiffs presented no details as to establishment of an effective compliance policy to prevent Program violations. The Government further notes that plaintiffs presented no substantive evidence of establishment of training programs on trafficking prohibitions. Plaintiffs claim that they were not asked to provide details of the Program or an effective compliance policy. The Government attributes plaintiffs to have provided "the same explanations for the irregular EBT transactions in addition to statements from customers."

ARO Furbee conducted a July 21, 2008 telephone interview with Mr. Mansour.

ARO Furbee issued his August 4, 2008 Final Agency Decision ("final decision") "that there is sufficient evidence to support a finding that a Permanent Disqualification from participation as an authorized retailer in the Food Stamp Program was properly imposed." ARO Furbee identified the issue as "whether Two Way is the type of store which can support large and/or multiple transactions in the dollar amounts exhibited in the raw transaction data, and whether there is sufficient information, through a preponderance of evidence, that it is more likely true than not true that the questionable transactions were the result of trafficking."

In his final decision, ARO Furbee found or noted:

1. "[G]iven all that is involved in the checkout process, it is highly unlikely that transactions as large as those cited by the [FNS] Field Office could have been processed as swiftly as they were, irrespective of whether one household was shopping on behalf of another";

2. "Given the length of time that elapsed between these transactions . . . it is unlikely that they were made by households that shopped together but requested separate receipts";

7

3.  "[I]t is unlikely such transactions involved solely the purchase of eligible foods, either by recipients seeking to determine their EBT balance or, for that matter, by food stamp households that were shopping together";

4.  "[I]t is highly unlikely that the respective recipients specifically requested separate receipts for perishable and non perishable items purchased during the same visit";

5.  "[M]ultiple transactions over a short period of time, especially of high dollar value, are indicative of attempts to diminish attention to signs of trafficking";

6.  "[E]ven if recipients attempted to assemble grocery orders ending in even dollar amounts, it would have been statistically impossible for them to do so, given the manner in which Appellant [plaintiffs] priced its stock";

7.  [I]t is unlikely that children would be making EBT purchases of $40.00 or more, since they lacked transportation to bring large grocery orders home";

8.  "[G]iven the transaction amounts, which range from $20.99 to $339.95, it is unlikely that the transactions involved the purchase of eligible food items by children since, as previously discussed, children would not have access to the transportation necessary to carry large quantities of food items to their households";

9.  "Neither of the two store visits show the cooler referenced by Appellant, nor do they reflect any availability of the meat and poultry products described on Appellant's invoices, other than in the store's hot foods section";

10. "[W]hile Appellant does purchase meat and poultry items, such items are most likely sold as hot foods, which may not be purchased with food stamp benefits";

11. The "evidence preponderates in favor of a conclusion that Appellant was not selling such items [sweet potatoes and greens] to the general public, or if it was, they were sold as hot foods that would have thus been exempted from purchase with food stamp benefits. In that regard, it is not possible to conclude with any degree of certainty that the large transactions cited by the Field Office resulted from customers' bulk purchases of meat, poultry and/or produce items";

12. The "percentage of manual key entered transactions is far greater than the norm for stores

of Appellant's size operating in the State of California";

13. An "analysis of household whose transactions were frequently manually key entered . . . reflects that such households for the most part did not have transactions that were manually key entered when they shopped at other stores";

14. A "record of participation in the FSP [Program] with no previously documented instance of violations does not constitute valid grounds for dismissal of the current adverse action to permanently disqualify the firm from the ESP";

15. Since plaintiffs submitted only "undated documents that reference the FSP rules and regulations, as well as documents entitled Rules and Regulations Acceptance Form . . . it is not possible to render any findings or conclusions regarding the effectiveness of Appellant's compliance policy as it relates to the allegations in this proceeding"; and

16. Plaintiffs "did no provide [required] documentation within the specified time limit, and as a consequence, the Field Office did not impose a civil money penalty in lieu of permanent disqualification."

In sustaining plaintiffs' permanent disqualification, ARO Furbee concluded:

> The Field Office's analysis of Appellant's EBT transaction record, upon which charges of violations are based, together with observations made during two store visits and an analysis of household shopping patterns, provides substantial evidence that it is more likely true than not true that program violations did, in fact, occur as charged, and that the Field Office has provided adequate evidence of trafficking violations. Appellant's contentions do not outweigh this evidence.

**Plaintiffs' Claims**

Plaintiffs filed this action to seek this Court's de novo review of plaintiffs' permanent disqualification in that "the Final FNS Decision is void of any substantial evidence" to support permanent disqualification and "is based on assumptions and unsubstantiated conclusions" and the Government "has no tangible evidence that Plaintiff engaged in 'trafficking.'" In addition, plaintiffs' complaint alleges claims that the administrative process and permanent disqualification denied plaintiffs' due process and other unidentified constitutional rights, including absence of opportunity for oral testimony, cross-examination and eligibility for a civil monetary penalty. The complaint seeks to set aside the permanent disqualification, an injunction from enforcement of the permanent disqualification,

9

and a declaration that permanent disqualification is "unlawful and unconstitutional."

## DISCUSSION

### Summary Judgment/Adjudication Standards

The Government seeks summary judgment on plaintiffs' claims in that "there are no genuine issues of material fact as to the occurrence of violations" and "the administrative review process was legally sufficient to provide the Plaintiff[s] with an opportunity to respond to the allegations."

F.R.Civ.P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on all or part of the claim." Summary judgment is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(c); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters. F.R.Civ.P. 56(c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). The evidence of the party opposing summary judgment is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

To carry its burden of production on summary judgment, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of

persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598. "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d at 574. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make the showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")

"But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

Under F.R.Civ.P. 56(d)(1), a summary judgment/adjudication motion, interlocutory in character, may be rendered on the issue of liability alone. "In cases that involve . . . multiple causes of action, summary judgment may be proper as to some causes of action but not as to others, or as to some issues

but not as to others, or as to some parties, but not as to others." *Barker v. Norman*, 651 F.2d 1107, 1123 (5th Cir. 1981); *see also Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990); *Cheng v. Commissioner Internal Revenue Service*, 878 F.2d 306, 309 (9th Cir. 1989). A court "may grant summary adjudication as to specific issues if it will narrow the issues for trial." *First Nat'l Ins. Co. v. F.D.I.C.*, 977 F.Supp. 1051, 1055 (S.D. Cal. 1977).

As discussed below, the Government has not carried its initial burden of production in that it fails to distill the administrative record to demonstrate plaintiffs' permanent disqualification.

### De Novo Review

Plaintiffs' permanent disqualification is subject to this Court's de novo review. *See* 7 U.S.C. § 2023(15) ("The suit in the United States district court . . . shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue . . .") "In this trial de novo the burden of proof shifts, and plaintiffs must establish by a preponderance of the evidence that the violations did not occur." *Lopez v. United States*, 962 F.Supp. 1225, 1228 (N.D. Cal. 1997) (citing *Goodman v. United States*, 518 F.2d 505, 511-12 (5th Cir.1975)). On a summary judgment motion, however, "the moving party retains the burden of showing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law." *Lopez*, 962 F.Supp. at 1228-1229.

With a trial de novo, where "existence of a violation is examined afresh," the parties "are not limited in their arguments to the contents of the administrative record." *Kim v. United States*, 121 F.3d 1269, 1274 (9th Cir. 1997). "By providing the aggrieved food store with a new trial where the store may introduce evidence outside the administrative record, the statute also protects the rights and interests of the store against final adverse action without the opportunity for an adversary hearing." *Redmond v. United States*, 507 F.2d 1007, 1011-1012 (5th Cir. 1975).

Although review of an FNS finding that a retailer violated the Act is de novo, review of the FNS imposed sanction is governed by "the arbitrary and capricious standard." *Wong v. United States*, 859 F.2d 129, 132 (9th Cir. 1988). "Once the district court finds that violations were committed, it may not overturn the sanction unless it finds that the sanction was arbitrary and capricious." *Wong*, 859 F.2d at 132. Under the arbitrary and capricious standard, a court examines "the sanction imposed by the FNS in light of the administrative record to judge whether the agency properly applied the regulations [and]

to determine whether the sanction is 'unwarranted in law . . . or without justification in fact' (citation omitted)." *Plaid Pantry Stores, Inc. v. United States*, 799 F.2d 560, 563 (9th Cir.1986) (per curiam). Agency action is not "arbitrary and capricious if the action is rational, based on relevant factors, and within the agency's statutory authority." *Frisby v. U.S. Dept. of Housing and Urban Development*, 755 F.2d 1052, 1055 (1985) (citing *Motor Veh. Mfgrs. Ass'n. v. State Farm Mut.*, 463 U.S. 29, 103 S.Ct. 2856, 2866 (1983)).

## **FNS' Violations Determination**

The Government argues that the administrative record establishes trafficking violations (buying or selling Program benefits for cash or consideration other than eligible food). The Government notes that it must show that plaintiffs redeemed Program benefits "for consideration other than eligible food items." The Government contends that it has "established through the administrative record and corroborating evidence that numerous violative sales occurred" and that plaintiffs "cannot deny that certain violative transactions occurred" and "cannot offer any material evidence which is sufficient to raise a genuine issue of material fact."

The Government notes that FNS may base its violations finding on on-site investigations or EBT transaction reports and that a reviewing administrative officer may uphold an FNS field office's decision to disqualify if the retailer "cannot reasonably explain the suspicious patterns in the store's transactions." According to the Government, plaintiffs' "contentions do not outweigh the evidence and the record has yielded no indication of error or discrepancy." The Government continues that since permanent disqualification is warranted for "first occasion" trafficking, plaintiffs bear the burden "to raise material issues of act as to each of the transactions set forth as unusual or irregular." The Government accuses plaintiffs of failing "to provide relevant evidence to explain the more than 575 suspicious transactions."

Plaintiffs respond that they raise factual issues to defeat summary judgment based on their following explanations of the transactions at issue:

1. Customers swipe multiple cards for combined purchases of multiple family members or friends;

2. A customer swipes one card multiple times for different family members' portions of a purchase;

1    3.   Customers make a single, monthly purchase because they lack transportation;

2    4.   Customers buy large amounts for family outings to deplete their EBT balance;

3    5.   Customers budget their EBT balances by debiting a certain amount and paying a
4         purchase's remainder in cash;

5    6.   EBT cards are processed to check balances prior to purchases;

6    7.   Limits on purchases by children or family members are honored;

7    8.   Manual key entries are required for numerous damaged EBT cards; and

8    9.   Customers are provided multiple receipts on request.

Plaintiffs fault FNS' failure to contact Two Way customers who provided 22 letters in the administrative record and who could verify plaintiffs' explanations as to the small percentage of transactions which FNS found irregular. Plaintiffs note that during the August 21, 2006 and February 8, 2008 visits, the FNS representative identified no violations.

Plaintiffs hold the Government to establish that Two Way "redeemed food stamp coupons for consideration other than eligible food items." *See Wehab v. Yeutter*, 743 F.Supp. 1353, 1357 (N.D. Cal. 1990) (" to establish violations of these regulations, therefore, the Government must show by admissible evidence . . . that food stamp coupons were accepted by plaintiff as payment for ineligible items"). Plaintiffs note that the Government "cannot point to one single customer or transaction in which Two Way redeemed food stamps for cash and ineligible food items." Plaintiffs note an absence in the administrative record of attempt to redeem benefits for cash or to use benefits for ineligible items. Plaintiffs note the absence of their admission of improper transactions. Plaintiffs point to the declaration of Two Way's meat supplier Mike Pestorich ("Mr. Pestorich") that "I never made any comment to any representative from a Food Stamp Program, the Food and Nutrition Service, or any other representative from a United States food stamp program, that Two Way Fruit Stand cooks all of the meat I sell them, or that they sell it all as hot food."

Plaintiffs conclude that their explanations demonstrate that a small percentage of customers (eight percent) "have certain shopping practices which result in multiple transactions in short periods of time, depleting entire funds, only charging to a certain round number dollar amount, having their children shop for them, checking their balance before they shop, buy in bulk because they do not have

transportation . . ., and pooling their food stamps so that more than one stamp is swiped for a single purchase."

The Government's position is that plaintiffs fail to demonstrate that trafficking violations did not occur. This Court construes the Government's position as trafficking violations occurred and plaintiffs must raise factual issues that such violations did not occur. The Government's papers gloss over the administrative record and fail to set forth specific evidence of trafficking violations. The Government failed to delve into the administrative record to pinpoint evidence of trafficking. The Government's approach is "look at the administrative record, FNS found violations, so there must have been violations." The Government provides little assistance to this Court's de novo review and as such fails to substantiate its summary judgment burden to demonstrate the absence of material factual issues or that plaintiffs lack evidence to challenge permanent disqualification. The Government has not done its job.

On the other hand, plaintiffs have tipped the scales barely enough to avoid summary judgment. Plaintiffs have provided declarations of five customers to support their explanations of irregular transactions.[3] The Government may not accept plaintiffs' explanations but offers little meaningful challenge to them other than bare references to the administrative record. The Government bears the burden to demonstrate the absence of factual issues and may not rely on this Court to scour the administrative record to find evidence of violations for the Government. Moreover, plaintiffs raise valid points as to the absence of firsthand or direct evidence of improper transactions or plaintiffs' admissions of them. Although the EBT transactions compiled by FNS may indicate improper transactions, mere reference to them is not enough to carry the Government's summary judgment burden. In addition, the Government's reliance on ARO Furbee is unavailing in that his conclusions are based largely on an "unlikely" analysis of plaintiffs' explanations and evidence, not rigorous summary judgment evidentiary standards.

---

[3] The Government seeks to exclude the declarations in that the declarants were not identified in initial disclosures and discovery responses. However, the Government cites not binding, supporting authority to exclude the declarations in the setting of a trial de novo where the retailer is empowered to present evidence beyond the administrative record to protect the retailer's interests. *See Redmond*, 507 F.2d at 1011-1012. Moreover, FNS and the Government have been aware of the delcarants in that they submitted letters to support plaintiffs but FNS elected not to contact any of the supporters.

**Permanent Disqualification Sanction**

The Government notes that permanent disqualification is an available sanction for "the first occasion" of "trafficking in coupons or authorization cards." 7 U.S.C. § 2021(b)(3)(B). However, FNS has "discretion to impose a civil penalty of up to $20,000 for each violation . . . in lieu of disqualification . . . if the Secretary determines that there is substantial evidence that such store or food concern had an effective policy and program in effect to prevent violations." 7 U.S.C. § 2021(b)(3)(B). Such evidence includes:

> (i) the ownership of the store or food concern was not aware of, did not approve of, did not benefit from, and was not involved in the conduct of the violation; and
>
> (ii)(I) the management of the store or food concern was not aware of, did not approve of, did not benefit from, and was not involved in the conduct of the violation; or
>
> (II) the management was aware of, approved of, benefitted from, or was involved in the conduct of no more than 1 previous violation by the store or food concern.

7 U.S.C. § 2021(b)(3)(B).

The Act's regulations provide that "FNS may impose a civil money penalty in lieu of a permanent disqualification for trafficking . . . if the firm timely submits to FNS substantial evidence which demonstrates that the firm had established and implemented an effective compliance policy and program to prevent violations of the Program." 7 C.F.R. § 278.6(i).

The Government contends that the Act and its regulations obligated FNS to impose the disqualification penalty and putting aside such requirement, plaintiffs failed to request a monetary penalty to waive it. The Government concludes "there is no basis for altering" the FNS decision.

Plaintiffs respond that permanent disqualification "is too harsh of a penalty" in the absence of: (1) direct evidence of improper transactions; (2) prior Two Way violations during its 30 plus year-participation in the Program; and (3) a warning of potential trafficking. Plaintiffs propose that a six-month penalty is sufficient.

Once again, the Government relies on a presumption of trafficking and as such, that permanent disqualification is a given. The Government provides nothing substantive to assist in this Court's examination whether FNS properly applied the regulations to warrant permanent disqualification under the law and facts. The Government fails to explain that permanent disqualification was rationally based

on relevant factors and even if permanent disqualification was within FNS authority. The Government's reliance on permanent disqualification as an option is insufficient. The Government, not this Court, is obligated to pinpoint to the administrative record and other evidence to substantiate permanent disqualification. The Government's reliance on FNS findings is insufficient. The Government provides no meaningful assistance to this Court's review whether permanent disqualification is arbitrary and capricious and as such fails to substantiate its summary judgment burden to demonstrate absence of material factual issues or that plaintiffs lack evidence to challenge permanent disqualification. Again, the Government has not done its job, whereas plaintiffs raise issues to suggest that permanent disqualification is arbitrary and capricious.

### Due Process Violations

Plaintiffs' complaint alleges that FNS acted arbitrarily to deny plaintiffs due process. The Government responds that "the statutory and regulatory scheme in its entirety (administrative and judicial) assures due process protection to the affected store owners."

The Government cites to *Inbrahim v. United States*, 650 F.Supp. 163, 167 (N.D.N.Y. 1987) *aff'd*, 834 F.2d 52 (2nd Cir. 1987), where a fellow district court concluded that "a trial de novo certainly satisfies due process requirements" and explained:

> An individual is entitled to a hearing before being deprived of a property interest. *Loudermill*, 105 S.Ct. at 1493. A pretermination hearing, "though necessary need not be elaborate." 105 S.Ct. at 1495. As the Supreme Court has stated the nature of the hearing may vary "depending on the importance of the interests" and "the nature of subsequent proceedings." *Id*. (citations omitted). Furthermore, "'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action." *Id*. quoting *Matthews v. Eldridge*, 424 U.S. 319, 324, 96 S.Ct. 893, 906-907, 47 L.Ed.2d 18 (1976).
>
> In *Matthews*, 424 U.S. 319, 96 S.Ct. 893, the Supreme Court set forth three factors by which to judge the sufficiency of the administrative procedures:
>
> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."
>
> *Id*. at 335; 96 S.Ct. at 903. Applying these factors to this case, this court finds that plaintiff has been accorded all the process that is due.

Here, the private interest-continued participation in the food stamp program-is strong; however, as noted above, retailers are only incidental beneficiaries under the statutory scheme. Their interest, therefore, must be placed in perspective and considered in light of the third factor – the government's interest in administering the program for the primary beneficiaries. As the legislative history of the Food Security Act of 1985 indicates, Congress hoped to reduce food stamp abuse by rapidly implementing disqualification decisions. Finally, the risk of erroneous deprivation is slight because, at the administrative level plaintiff receives notice of the charges, an opportunity to respond in writing or in person, and an opportunity to appeal to a review officer. Furthermore, at the judicial level, plaintiff is entitled to a hearing at which to demonstrate a likelihood of prevailing on the merits. 7 U.S.C. Section 2023(a); see also *Barbosa v. United States*, 633 F.Supp. 16, 17 (E.D.Wis.1986).

This court concludes, therefore, that plaintiff has a property interest in continued participation in the food stamp program and cannot be deprived of this interest without due process. This court finds, however, that the procedures for administrative and judicial review provide plaintiff with all the process that is due.

"A trial de novo, in which the existence of a violation is examined afresh, and the parties are not limited in their arguments to the contents of the administrative record, satisfies the strictures of procedural due process." *Kim v. United States*, 121 F.3d 1269, 1274 (9th Cir. 1997). "Permanently disqualifying innocent store owners who lack an effective program or policy to prevent trafficking violations therefore survives rational basis scrutiny because it fulfills the legitimate governmental objective of promoting adoption of such effective programs or policies." *Kim*, 121 F.3d at 1274.

To support absence of a due process violation, the Government points to the charge letter which "outlined in detail the suspicious sets of EBT transactions through 20 pages of attachments." The Government notes that such data included the date, time, household number, dollar amount, and method of input of each "suspicious or irregular" EBT transaction. The Government argues that nothing in the charge letter and its attachments "can be construed as arbitrary or 'constitutionally vague.'"

The Government notes plaintiffs' opportunity to respond in writing to the charge letter and presentation of comments during a telephone interview with ARO Furbee. The Government concludes that plaintiffs "had all the information needed to directly address the charges of trafficking" and "the opportunity to meaningfully explain or specifically address the more than 575 suspicious EBT transactions."

Other than their complaint, plaintiffs do not challenge the constitutionality of the administrative and judicial process. The Government's points are well taken, and this Court finds no constitutional

deficiency in the administrative and judicial process. The issue is not whether plaintiffs received due process. The issue is whether the Government has demonstrated that it is entitled to summary judgment that permanent disqualification is warranted. The Government has not to require trial on the permanent disqualification issues.

**CONCLUSION AND ORDER**

For the reasons discussed above, this Court:

1. DENIES the Government summary judgment on plaintiffs' (first) de novo judicial review, (fifth) declaratory relief and (sixth) injunctive relief claims; and
2. GRANTS the Government summary adjudication on plaintiffs' (second, third and fourth) denial of due process and unconstitutional regulation claims.

IT IS SO ORDERED.

**Dated:     November 9, 2009**                     /s/ Lawrence J. O'Neill
                                                                    UNITED STATES DISTRICT JUDGE